UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHNNY A. JOHNSON,          )
                                )
        Petitioner,        )
                                )
        vs.            )    Case No. 4:13CV00278 HEA
                                )
TROY STEELE,             )
                                )
        Respondent.     )

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on the petition of Johnny A. Johnson for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This is a capital case. For the reasons set forth below, the petition is denied.

Factual Background

The following statement of the facts giving rise to petitioner's trial and conviction are taken from the Missouri Supreme Court in *State v. Johnson,* 207 S.W. 3d 24 (Mo. 2006) affirming his convictions for first-degree murder and a recommended sentence of death. The jury also convicted him of armed criminal action, kidnapping, and attempted forcible rape and recommended life sentences for these crimes.

Johnson's convictions resulted from the murder of six-year old Casey Williamson on July 26, 2002. Casey lived with her mother, Angie, and her siblings at her grandfather's home on Benton Street in Valley Park. Casey's parents were separated and her father, Ernie, lived across the street, in the home of Michelle Rehm and her

boyfriend Eddy, so that he could remain close to his children.

Two days before Casey's murder, on July 24, 2002, Johnson went to Michelle's house to look for Eddy and Ernie. That same day, he was seen by Casey's sister, Chelsea, and her friend, Angel, when they were riding bikes on Benton Street. Chelsea and her friend noticed that Johnson was following them and sped up as they returned home.

On the night of July 24, 2002, Angie took the children to Michelle's house to spend the night with Ernie. Johnson also stayed at Michelle's house that evening. The next morning, July 25, 2002, Angie awoke to find Casey on the couch watching cartoons with Johnson. Johnson told Angie that Casey was not bothering him. Unbeknownst to anyone at the time, however, Johnson had begun to think Casey was "cute" and had "ideas" of wanting to have sex with her.

That day, Angie took the children back to her grandfather's house for the day. At one point during the day, Casey, her sister, and other friends, including Angel, were at the home by themselves. Angel noticed Johnson sitting on a chair by the deck and locked the door. Angel later heard knocking but did not answer the door.

On the evening of July 25, 2002, Johnson joined in a barbeque at Michelle's house. That evening, Casey and her siblings again spent the night with their father at Michelle's house.

The next morning, July 26, 2002, Ernie awoke around 6:00 a.m. to prepare for work. Casey awoke and said she was hungry. Ernie told her that he would take her to her grandfather's house to get breakfast and told her to wait upstairs while he went downstairs to get ready for work. Downstairs, he noticed Johnson asleep on the couch.

Casey did not stay upstairs. Johnson awoke to find Casey standing near the couch watching television and sensed this was his best opportunity to have sex her. He had decided that to avoid being caught for sexually assaulting her, he would kill her after having sex with her. Johnson asked Casey if she wanted to go to the glass factory to play games and have fun. Casey said she would go with him and they left. Casey was wearing only her night-gown and underwear. As they walked down Benton Street and into an alley, Casey complained her feet hurt and Johnson picked her up and carried her. When they came to the woods leading to the glass factory, they walked along one of the paths to a sunken pit with brick and concrete walls more than 6 feet high. Casey and Johnson crawled through a small tunnel and dropped into the pit.

The glass factory, a popular hangout for neighborhood kids, refers to an abandoned factory surrounded by wooded areas and a series of trails. Johnson asked Casey if she wanted to see his penis. She said no, but he pulled down his shorts and exposed himself. Casey turned her head away. Johnson then asked Casey to pull down her panties so he could see her vagina. She said no, and Johnson grabbed her underwear, tore it off her, and forced her to the ground. Pinning her to the ground with his chest, Johnson attempted to achieve an erection by rubbing his penis on Casey's leg. Casey started screaming, kicking, and pushing at Johnson, scratching his chest.

Even though he had not yet raped Casey, Johnson got up and decided to kill her. He grabbed a brick and hit Casey in the head with it at least six times, causing bleeding and bruising. She was not yet dead or knocked unconscious and started to run around the pit. Johnson hit her with the brick again. She fell to her knees and tried to crawl away from Johnson. He struck her with the brick again, eventually knocking her

to the ground and fracturing the right side of her skull. Because she was still moving, Johnson then lifted a basketball-sized boulder and brought it down on the back, left side of Casey's head and neck, causing multiple skull fractures. Casey inhaled and exhaled "really fast" and then stopped breathing.

Johnson wiped blood from Casey's face with her underpants and then threw them in an opening in the wall. He buried Casey with rocks, leaves, and debris from the pit. He then went to the nearby Meramec River to wash Casey's blood and other evidence from his body.

The police were looking for Johnson. Officer Chad Lewis met up with him. He had Johnson get in a police car to talk because there were so many people in the area. Without any question being asked, Johnson said he would not hurt "little kids" and that he liked them because he had one of his own. He explained to Officer Louis that he had gone for a swim in the river and explained his route there. Officer Louis thought Johnson's route was unusual because most locals would have cut through the glass factory to get to the river. He asked Johnson if he had been in the glass factory, which Johnson denied. At Officer Louis's request, Johnson agreed to go to the police station to talk in private.

While at the station, Johnson was identified by a witness who had seen him carrying Casey that morning. Around 8:30 a.m., Detectives Neske and Knieb arrived at the station and took Johnson to a police substation that had an open interview room. On the ride to the substation, Johnson was informed of his rights and indicated he understood them. At the substation, around 9:25 a.m., Johnson signed a waiver form after again being advised of his rights. Johnson said he wanted to make a statement.

For about an hour, Johnson and Detective Neske conversed, and Johnson denied seeing or being with Casey that morning. Even when confronted with accounts of witnesses seeing him with Casey that morning, Johnson continued his denials.

When Detective Neske brought up a hypothetical about Johnson's son being missing, Johnson became angry. Johnson said he was being treated for schizophrenia and had been hospitalized for it in the past. Johnson denied that he was hearing voices and said he usually only saw shadows, but he denied having any hallucinations at that time. Johnson said he had not taken any medication for a month and was not suffering from it anymore.

The detectives took a break from talking with Johnson and brought him food. In the early afternoon, about 1:30 p.m., Johnson agreed to submit to a rape kit. Before the samples were collected, Detective Neske told Johnson that they would determine his involvement and said he needed "to be a man and tell me where she's at." Johnson started crying and said, "She's in the old glass factory."

When asked if Casey was alive, Johnson said she was dead and it was an accident.  He said that Casey wanted to go to the glass factory with him and that a rock had fallen from the pit wall when he was climbing it and hit Casey's head, killing her. Johnson said he then "freaked out," thinking he would not be believed, and buried Casey. He said he went to the river to kill himself but could not. Johnson drew two maps to help officers find Casey's body, but officers at the scene were unable to find the body and Johnson was taken there.

Before Johnson arrived, however, a private citizen who had joined the search for Casey that morning came upon the tunnel leading to the pit where Johnson had

taken Casey. In the middle of the pit, he saw a pile of rocks, blood around the pile, and Casey's foot between the rocks. He saw "a piece of concrete that probably weighed a hundred pounds" where Casey's head would have been. Police arrived and secured the pit.

Johnson was taken to police headquarters. Detective Neske observed the pit and spoke with an officer who was processing evidence at the scene. The evidence officer told Detective Neske that there was no place to climb out of the pit and said there was blood all over the floor of the pit, which contradicted Johnson's story.

Detective Neske went to police headquarters to talk with Johnson. He again advised Johnson of his rights and the waivers and said he had been to the scene and did not think it was an accident. Johnson then told Detective Neske that once he and Casey were in the pit, he had asked Casey if she wanted to see his penis and pulled down his pants. Johnson said that he asked Casey to show him her vagina and pulled off her underwear, which caused her to start "freaking out" and saying she would tell her parents. Johnson said this caused him to start "freaking out" as well, and he picked up the brick and hit her a couple of times in the head, then dropped the "boulder" on her head. He said he wanted her to expose herself so he could masturbate. He said he wiped blood from Casey's face with the underwear, discarded it, buried the body, and went to the river to wash off the blood. Around 8:30 p.m., Johnson repeated this version of events in an audiotaped statement. In these statements, Johnson did not admit that he intended to take Casey, rape her, or kill her prior to entering the pit.

Later that night, around 11:30 p.m., Detective John Newsham was instructed to take Johnson to the county jail. While Johnson was awaiting booking, Detective

Newsham began discussing reading with him. Johnson said he liked to' read the Bible and was concerned about his "eternal salvation." He said he was "fine," and that he "felt he was going to receive the death penalty and that he wanted to be executed." He asked Detective Newsham, "[D]o you think I'll ever achieve eternal salvation[?]" Detective Newsham thought that Johnson was indicating he had not been completely honest earlier and he took this as an opportunity to get more information. He told Johnson that to be forgiven for this crime he had to be completely truthful and honest and not leave out details. Johnson admitted he had not been completely honest. Johnson was returned to police headquarters, again waived his rights, and made verbal and audiotaped statements. In these statements, he admitted that he intended to take Casey for the purpose of having sex with her and planned to kill her after doing so.

An autopsy showed that Casey died from blunt force injuries to her head, which caused skull fractures and bruising of her scalp and brain. She also suffered injuries to her arms, shoulders, legs, and back. Her blood was found on Johnson's shirt, a brick, and large rock recovered from the pit. Johnson's semen was found on his shorts.

At trial, Johnson did not deny killing Casey, but disputed that he deliberated before doing so. He asserted a diminished capacity defense that he could not deliberate due to mental illness, specifically schizo-affective disorder that caused command hallucinations to rape and kill Casey. In rebuttal, the State's expert testified that Johnson was capable of deliberation and any hallucinations that he may have had at the time were due to methamphetamine intoxication, not psychosis.

Procedural Background

Petitioner is currently confined at the Potosi Correctional Center at Mineral Point, Missouri. He was convicted on January 17, 2005 of Murder in the First Degree, Armed Criminal Action, Kidnapping, and Attempted Forcible Rape. On January 18, 2005 the jury recommended a sentence of death. On March 7, 2005 the trial judge in the Circuit Court for St. Louis County imposed the sentence of death for the offense of Murder in the First Degree and three consecutive sentences of life imprisonment for the offenses of Armed Criminal Action, Kidnapping and Attempted Forcible Rape.

Petitioner appealed his conviction and sentence to the Missouri Supreme Court, which has exclusive jurisdiction in capital cases. On appeal to the Missouri Supreme Court the appeal was denied. The convictions were affirmed on November 7, 2006.

On direct appeal Petitioner asserted error when the prosecutor struck two jurors in violation of *Batson v. Kentucky*, 476 U. S. 79 (1986); the trial court erred in submitting a voluntary intoxication jury instruction; the aggravating factor of depravity of mind was unconstitutionally vague and overbroad and it failed to limit the jury's discretion; the court erred in refusing to allow counsel to ask venirepersons whether knowledge that first-degree murder required deliberation would prevent them from considering life imprisonment; the trial court erred in admitting evidence that Petitioner stalked children before the commission of the herein subject crime and this evidence was used to prove propensity; the prosecutor made improper arguments in the guilt and penalty phase of closing arguments; the trial court committed error by submitting instructions 24 and 26 because they did not require the state to prove beyond a reasonable doubt that the mitigating factors outweighed the aggravating factors and failed to inform the jury they must impose life imprisonment if the jury was divided;

the prosecution failed to charge aggravating circumstances in the information.

On May 29, 2007 the United States Supreme Court denied the application by Petitioner for Writ of Certiorari.

Petitioner also filed with the trial court, on March 16, 2007, a post-conviction relief motion pursuant to Missouri Supreme Court Rule 29.15. Motion counsel was appointed for Petitioner. He alleged that trial counsel was ineffective for failing to investigate and present social and medical history; failing to consult with a neuropsychologist and present brain damage evidence; failing to present childhood abuse and neglect, and limited intelligence evidence; failing to rebut expert testimony that Petitioner's behavior resulted from drug use. Petitioner also asserted in his post-conviction relief motion that trial counsel was ineffective for failing to move to suppress his post-arrest statements; failing to investigate and present evidence of his low IQ. The Missouri state trial and motion judge conducted a hearing over 4 days-November 30, 2009, December 1, 2009, December 2, 2009, and July 30, 2010. On April 5, 2011 the state court judge rendered his Findings of Fact, Conclusions of Law, Order, Judgment and Decree of Court. He denied the claims asserted by Petitioner in his 29.15 motion.

On January 29, 2013 the Circuit Court's ruling was affirmed on appeal by the Missouri Supreme Court in *Johnson v. State*, 388 S.W.3d 159 (Mo. banc 2012). The Missouri Supreme Court denied rehearing.

Petitioner asserts claims here previously not asserted as well. He claims his death sentence is unconstitutional because he is mentally retarded and that the prosecutor made improper arguments in the guilt and penalty phase of closing

arguments.

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA), <u>28 U.S.C. § 2254(d)</u>, limits the scope of judicial review in a habeas proceeding. "[AEDPA] modified

> a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." In fact, when a claim has been adjudicated on the merits in state court, an application for writ of habeas corpus may only be granted where the state court adjudication:
>
>> (1)  resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. <u>28 U.S.C. § 2254(d)(1)</u>, <u>(2)</u>.

*Colvin v. Taylor*, <u>324 F.3d 583, 586-87</u> (8th Cir.) (emphasis added, citations omitted), *cert. denied*, <u>540 U.S. 851</u> (2003).

Under the "contrary to" clause of <u>28 U.S.C. § 2254(d)(1)</u>, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, <u>529 U.S. 362, 413</u> (2000).

"In applying the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Evans v. Rogerson*, <u>223 F.3d 869, 872</u> (8th Cir. 2000) (citations omitted). An "unreasonable application" can also occur where "the state court either unreasonably extends a legal principle

from [Supreme] Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, <u>529 U.S. at 407</u>. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 409. "Rather, that application must also be objectively unreasonable." *Id.* at 411.

In reviewing a state court conviction, a federal habeas court also presumes that a state court's factual determinations are correct; this presumption may be rebutted only by clear and convincing evidence. <u>28 U.S.C. § 2254(e)(1)</u>. "The presumption of correctness applies to all factual determinations made by state courts of competent jurisdiction, including trial courts and appellate courts.*" Pruett v. Norris*, <u>153 F.3d</u> <u>579, 584</u> (8th Cir. 1998). This Court will review petitioner's claims under these pronounced standards.

Federal habeas review is limited, and a state prisoner must fairly present his or her claims to state courts during direct appeal or in post-conviction proceedings. *Sweet v. Delo*, 125 F.3d 1144, 1149 (8th Cir. 1997). Should the prisoner fail in raising a claim in a post-conviction relief appeal, the claim is abandoned. *Id.* at 1150 (*citing Reese v. Delo*, 94 F.3d 1177, 1181 (8th Cir. 1996)). Where a prisoner has defaulted his federal claims creating an independent and adequate state procedural bar, such as failing to raise claims on appeal, federal habeas review of the claims is barred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The procedural default may be cured if Petitioner can demonstrate legally sufficient cause for the default and actual prejudice resulting from it, or that newly discovered evidence proves the petitioner is probably actually innocent. *Coleman*, 501 U.S. at 750. In order to satisfy the "cause" requirement, a petitioner must show that an "external" impediment prevented him from

presenting his claim to the state court in a procedurally proper manner. *Id*. at 753.

*Martinez v. Ryan,* 132 S. Ct. 1309 was delivered on March 20, 2012. The Court observed that "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." It was also noted though that *Martinez* was not retroactive to cases on collateral review and was rule of equity and not one of constitutional stature.

<h2 style="text-align:center">CLAIMS[1]</h2>

**Was There Error in the Exercise of Peremptory Challenges by the Prosecution?**

Petitioner claims error in the prosecutor's exercise of peremptory challenges against 2 jurors as a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The Missouri Supreme Court considered the merits of this claim and rejected it on the merits of the assertion and the record. There, Petitioner argued the trial court committed error in overruling his *Batson* challenges to the prosecution exercise of peremptory strikes against an African American male juror named Murphy and an Asian female juror named Gilbert. His argument was premised on the race-neutral reasons for striking Murphy and Gilbert were pretextual and that the trial court wrongly denied him the opportunity to demonstrate pretext.

As the state Supreme Court explained:

> Parties cannot exercise peremptory challenges to remove potential jurors solely based on the jurors' gender, ethnicity, or race. *Strong,* 142 S.W.3d at 712. In raising a race-based *Batson* challenge, three steps are followed: (1) the defendant raises a *Batson* challenge with respect to a specific venireperson struck by the State, identifying the cognizable racial group to which that person belongs; (2) the State must supply a reasonably specific and clear race-neutral reason for the challenged strike; and (3) if the State provides and acceptable

---

[1] Petitioner has set forth a number of claims in his motion. They are numbered but sourced from different court proceedings in the history of his allegations. For the sake of clarity and ease of reference the court has organized the various claims consistent with when it is alleged that the claim may have arisen in relation to the record. The Court will address the claims accordingly.

reason for the challenged strike, then the defendant must show that the State's given reason or reasons were merely pretextual and that the strike was racially motivated. *Id.*

In determining pretext, the main consideration is the plausibility of the prosecutor's explanation in light of the totality of the facts and circumstances surrounding the case. *State v. Edwards,* 116 S. W. 3d 511, 527 (Mo. Banc 2003) The court also considers the presence of similarly situated white jurors who were not struck. *Strong,* 142 S. W. 3d at 712….

The following exchange took place after the prosecutor's peremptory strikes:

[Defense Counsel]: We'll make a Batson motion as to two jurors. The first one is…[Murphy], who is African-American male. We would ask the State to state their reason for that strike.

[Prosecutor]: Regarding [Murphy]…he is single, not married, with any children. As we know this case involves the death of a very young child and so I looked for jurors, among other things, who have children. He's also a youth specialist so he has some contact with kids working for the Division of Young Services for a number of years, if not an actual social worker or towards social work, works with troubled kids. My concern, he might see himself in the position to save the defendant or could identify with one of the kids he works with and treats for the past three years.

[Court]: I think that is a viable reason to deny the *Batson* challenge.

[Defense Counsel]: The other one is to both gender and race as to … Gilbert, who appears to be an Asian female.

[Prosecutor]: Also Mrs. Gilbert, though a married woman, indicates she has no minor children. She is a student, she lists her occupation as a student, and I'm trying to figure out how to be polite, she doesn't look to be the typical student age range, which leads me to believe she may be a professional student. Students tend not to have the sort of life experiences I think would be important life experiences you would have with kids and the life experiences being something other than a student.

[Court]: All right. I'll overrule the *Batson* challenge.

The Missouri Supreme Court went on to say:

Johnson fails to show that the States reasons for striking venire persons Murphy and Gilbert were pretextual and that the strikes were racially motivated. The State used each of its peremptory strikes to strike venire persons without minor children, including white venire persons who did not have children. "[I]t is well-recognized that an important factor in determining whether the defendant has proved purposeful discrimination is whether the State used peremptory challenges to remove similarly situated Caucasian

venire persons." *State v. Ashley,* 940 S.W.2d 927, 932 (Mo. App. 1997). Johnson cannot demonstrate pretext in the prosecutor's claim that one of his reasons for striking Murphy and Gilbert was their lack of minor children given that the State's challenges were exhausted removing minor less venire persons, while minority venire persons remained on the jury panel. *See State v. Shurn*, 866 S. W. 2d 447, 456(Mo. Banc 1993) ("[T]he prosecutor's failure to use all his challenges against blacks is relevant to show that race was not the motive for the use of peremptory strikes.").

Given the facts of the case, it was logical for the State to want jurors who had minor children. Johnson's counsel recognized the prosecutor's logic in striking minor less venire persons when she explained that she had struck a female venire person for reasons that included: "She has children. Just as the State indicated they were interested in finding jurors with children, we believe jurors with children might be a detriment to us because of the nature of the charge."

Johnson also fails to show there was pretext in the State's reasons for striking Murphy and Gilbert based on their occupations. "Employment is a valid race-neutral basis for striking a prospective juror." *State v. Williams*, 97 S.W.3d 462, 472 (Mo. banc 2003). It was logical for the prosecutor to believe that Murphy's work with the Division of Youth Services might make him more sympathetic to Johnson. Similarly, the prosecutor was concerned that Gilbert's occupation as a student caused her to lack sufficient life experiences he would prefer in jurors. The prosecutor's preference for jurors with life experience was demonstrated by his use of peremptory strikes against venire persons Schafer and Johnson, who had worked at their jobs less than a year, and venire person Milan, who was unemployed. Each of the jurors who served on the jury was employed for five or more years.

Johnson argues that the prosecutor's failure to ask questions during voir dire relating to his reasons for striking Murphy and Gilbert undermines the plausibility of his explanations. He asserts that if the issues of children or occupations truly mattered, the prosecutor would have inquired about those subjects on voir dire, rather than relying on juror questionnaire responses. In support of this proposition, Johnson cites *Miller–El v. Dretke*, wherein the United States Supreme Court found pretext where a prosecutor's purported reasons for striking a prospective juror were "makeweight" and "reek[ed] of afterthought" and the prosecutor had not inquired into the subject during voir dire, suggesting it did not "actually [matter]." 545 U.S. 231, 125 S.Ct. 2317, 2328, 162 L.Ed.2d 196 (2005) (citing *Ex parte Travis*, 776 So.2d 874, 881 (Ala.2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination")). Unlike in *Miller–El*, however, the prosecutor's reasoning in this case was not "makeweight" or "reeking of afterthought."

Johnson criticizes the prosecutor's failure to ask Murphy and Gilbert voir dire questions that would have illuminated their past experiences with children, but he does not allege that the prosecutor made similar inquires to other venire persons listed as without children on the questionnaires. The prosecutor's reliance on the questionnaire information

was warranted because sufficient information was available from the questionnaires to support his reasoning for striking Murphy, Gilbert, and the other venire persons without children who were struck.

*Yep*
*State v. Johnson*, 207 S.W.3d 24, 35-38 (Mo. banc. 2006) (footnotes omitted).


There is no ambiguity or confusion that striking a venireperson, solely due to race, is a violation of the Equal Protection Clause of the Constitution of the United States. *Batson v. Kentucky*, 476 U.S. 79 (1986). An objection must be made at the time and identify the race of a challenged juror in order to raise a *Batson* challenge. *Purkett v. Elem*, 514 U.S. 765 (1995). The State must then offer a race-neutral explanation but does not need to justify a strike for cause or even be plausible. *Id*. Once the State offers a race-neutral explanation, the burden then shifts back to the defendant to show that the State's justification is pre-textual. *Id*. It is then the obligation of the trial court to determine whether the defendant has carried its burden in proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352 (1991). The analysis of the Supreme Court of Missouri is consistent and not contrary to the current state of the applicable law.

The record fully demonstrates the consistency and correctness in the application of the law by the Supreme Court. Petitioner had the burden of demonstrating that the reasons set out by the prosecutor were pre-textual. In this Petitioner failed. The reasons stated by the prosecution relating to striking venirepersons Murphy and Gilbert supported a race-neutral basis. The State Supreme noted a highly relevant and salient fact in that the prosecutor failed to use peremptory strikes to remove all minorities and only those apparent minorities that fit the desire to not have jurors who did not have minor children. In addition, the record is devoid of any indication that trial counsel was denied any opportunity to further argue the point relating to pre-text.

The decision of the Missouri Supreme Court is consistent with a reasonable application of

*Batson v. Kentucky*  and the Missouri Supreme Court's ruling is reasonable in light of the evidence in the record. *See Taylor v. Roper*, 577 F.3d 848 (8th Cir. 2009).

**Was there Error in the Submission of a Voluntary Intoxication Instruction?**

Petitioner asserts that the submission of a voluntary intoxication instruction by the trial court was error. This claim was not submitted to the trial court and was not raised until he filed his direct appeal with the Missouri Supreme Court. That court concluded there was no plain error. It ruled:

> Johnson asserts that the trial court erred in submitting a voluntary intoxication instruction, Instruction 6, to the jury over his objections. He alleges the instruction was not supported by substantive evidence. He argues that the instruction misled jurors to believe that his defense was an intoxicated or drugged condition at the time of the crime, prejudicing his true defense of diminished capacity.

The Missouri Supreme Court continued and concluded:

> Johnson argues that giving Instruction 6 resulted in manifest injustice because it suggested that his defense was an intoxicated condition at the time of the crimes, which distracted jurors from his defense  that  he  was  unable  to  deliberate.  He  argues  that the distraction from Instruction 6 was compounded by the evidence of drugs and alcohol before the jury. Given that this evidence was presented, however, the trial court did not err, plainly or otherwise, in providing an instruction to clarify the jury's consideration of that evidence. Johnson is not entitled to relief on this point.

*State v. Johnson*, 207 S.W.3d at 43, 44.

The clear state of the law still requires a petitioner claiming instructional error to "shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage. *United States v. Frady*, 465 U.S. 152, 170 (1982).

The record shows that trial counsel objected to the instruction in question. The instruction, MAI-CR3d 310.50, was submitted by the prosecution. The instruction reads:

> The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated or a drugged condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct.

The evidence of the record demonstrates that the ruling of the State Supreme Court was reasonable. There was testimony that Petitioner had been doing meth for one or two days before the crimes were committed as well as testimony that he had been drinking and using marijuana in the time frame leading up to the murder. A Dr. English testified Petitioner abused alcohol, used marijuana and injected meth the day prior to the murder.

In order for Petitioner to be able to prevail on this claim there would have to be no evidence that he was intoxicated at the time the murder was committed. The record consequently disallows his duty to "shoulder the burden" of proving actual prejudice.

The decision of the Missouri Supreme Court is consistent with a reasonable application of federal law and the Missouri Supreme Court's ruling is reasonable in the light of the evidence in the record.

This Court should here note that a State's allowance of intoxication as a defense is a state-law issue, not a constitutional one. *Montanav. Egelhoff,* 518 U.S. 37 (1996). A contrary determination would run afoul of the non-retro activity principals of *Teague v. Lane*, 489 U.S. 288 (1989).

Finally, this claim is likely defaulted as it was not presented to the trial court.

**Was the Aggravating Factor of Depravity of Mind Unconstitutionally Vague and Overbroad and Thus Fail to Limit the Jury's Discretion?**

The Missouri Supreme Court reviewed and considered this claim on direct appeal. The Supreme Court found:

> Johnson alleges that the trial court erred in submitting Instruction 23 over his objections because it included the "depravity of mind" statutory aggravator, which he argues is "unconstitutionally vague." He contends that he was prejudiced by the vagueness of this aggravator because, had it not been given, the jury would have weighed the aggravating and mitigating factors differently and not recommended the death penalty.

The court later noted:

> This Court has repeatedly held that the depravity of mind language and limiting instruction, as represented in Instruction 23, provide sufficient guidance to sentencing jurors such that the instruction is not unconstitutionally vague. *Johns*, 34 S.W.3d at 115; *State v. Knese*, 985 S.W.2d 759, 778 (Mo. banc 1999); *State v. Ervin*, 979 S.W.2d 149, 166 (Mo. banc 1998); *State v. Butler*, 951 S.W.2d 600, 605–06 (Mo. banc 1997); *State v. Tokar*, 918 S.W.2d 753, 772 (Mo. banc 1996).

Continuing in its analysis the court stated:

> Johnson, however, contends that use of the limiting language is not a cure for the aggravator's vagueness. He argues that the addition of the limiting language improperly usurps legislative power because it adds requirements to section 565.032.2(7) that are not included in the statute. He also maintains that the limiting language wrongly results in judicial fact-finding.
>
> These arguments are without merit. The use of limiting language to clarify the requirements of the statutory aggravator is not an effort by the courts to engage in legislation. The limiting language gives meaning to the words used in the statute and ensures that the statute is constitutionally applied. This is statutory construction, which is clearly in this Court's purview. Further, use of the limiting language does not result in judicial fact-finding. The language expressly instructs the jury to determine if "depravity of mind" was involved based on the evidence in the case.

*State v. Johnson*, 207 S.W.3d at 45-46 (footnote omitted).

Fundamentally, as noted by Respondent, sentencing schemes in capital cases must necessarily provide a meaningful basis for distinguishing the few cases where the penalty is imposed and the many where it is not. *Godfrey v. Georgia*, 446 U.S. 420 (1980). Discretion of the sentence must be guided by clear and objective standards. *Proffitt v. Florida*, 428 U.S. 242 (1976). The sentencing guidelines must prevent arbitrary or capricious application of the death sentence. *Gregg v. Georgia*, 428 U.S. 153 (1976).

Petitioner's assertion is that the terms "repeated" and "excessive" are not defined. He argues that use of these terms violates the principles of *Godfrey v. Georgia* because depravity of mind could apply to any murder whereby more than one act of force is committed. Petitioner's argument is patently flawed in that the homicidal act in question relating to the instruction is that

words such as "repeated" and "excessive" were utilized to distinguish this homicidal act from any homicidal act. Those words are in fact the words that render the instruction constitutional. The evidence established the victim was struck repeatedly with a brick by Petitioner and then he dropped a large boulder on her head. If there was any error, it was cured by providing the limiting definition of "depravity of mind". See *Mallett*, 160 F.3d at 462. See also *State v. Griffin*, 756 S.W.2d 475, 489 (Mo. Banc 1988).

In addition, the Missouri Supreme Court's ruling is reasonable in the light of the evidence in the record and is consistent with a reasonable application of *Godfrey v. Georgia.*

**Did the Trial Court Err by Refusing to Allow Trial Counsel to Voir Dire Whether Knowledge that First -degree Murder Required Deliberation Would Prevent Consideration of Life Imprisonment?**

This claim was likewise raised on direct appeal before the Missouri Supreme Court. In ruling on the merits of the claim before it, the court noted:

> Johnson argues that the trial court erred by not allowing defense counsel's questions during voir that asked venire persons whether, knowing that first-degree murder is a coolly-reflected-upon, deliberated killing, they could consider a sentence of life imprisonment without probation or parole…
>
> During voir dire, defense counsel discussed that first-degree murder would not include self-defense, an accident, or catching a cheating spouse with a lover. The prosecutor objected, arguing that defense counsel was inappropriately attempting to define the crime of first-degree murder. He argued that it was the courts' responsibility to instruct the jury and the verdict director would provide jurors with the definition of deliberation and the elements of first-degree murder. Defense counsel explained that her questions were designed to elicit information about whether venirepersons who say they can consider a life sentence mean that they can consider a life sentence for a deliberate killing, not just an accidental killing or self-defense.
>
> The trial court found that defense counsel's questions did not give venire persons a "full and complete definition of murder first degree." It found that the questions "invade[d] the province of the court" and was an "improper attempt to instruct the jury on what the law is." The trial court suggested that defense counsel ask, "Can you give life without probation and parole if you find him guilty of first-degree murder [?]," rather than attempt to define first degree murder….

Johnson cites *State v. Gray,* 887 S. W. 2d 369, 379 ( Mo. Banc 1994), for the proposition that "[i]n order to discover bias of potential jurors, it is often necessary to reveal some factual or legal detail in voir dire." While it is true that the "trial court *may* permit parties to inquire whether potential jurors have preconceived notions on the law which will impede their ability to follow instructions on issues which will arise in the case," such decisions are properly left to the discretion of the trial court.  *State v. Ramsey*, 864 S.W. 2d 3210 335-36 (Mo. Banc 1993) (emphasis added)….

The concerns raised by *Gray* were avoided when the trial court prevented defense counsel's discussions about the requirements of first-degree murder. The court's proposed solution—asking "Can you give life without probation and parole if you find him guilty of first-degree murder [?]"—adequately permitted defense counsel to determine if venire persons could consider a life sentence in the case.

The trial court did not abuse its discretion in sustaining the prosecutor's objections to defense counsel's questions during voir dire. Having found no abuse of discretion, this Court need not consider the issue of prejudice. This point is denied.

*State v. Johnson*, 207 S.W.3d at 39-41.

Under *Morgan v. Illinois*, 504 U.S. 719, 732 (1992) The parties must be allowed to inquire into the potential juror's ability to follow the law. As correctly observed by Respondent, voir dire is conducted under the supervision of the trial court and a great deal must be left to its discretion. *Ristaino v. Ross*, 424 U.S. 589 (1976). The Constitution does not dictate a formula for voir dire, only that the defendant is afforded an impartial jury. *Dennis v. United States*, 339 U.S. 162 (1950). The court's exercise of discretion and the restriction upon inquiries by counsel are subject to the demands of fairness. *Aldrige v. United States*, 283 U.S. 308, 310 (1931).

Petitioner is not granted the opportunity to define the law in voir dire or any other stage of a criminal proceeding. The trial judge is the arbiter of the law applicable to the case on trial. The action and ruling of the state trial judge were squarely in line with Constitutional requirements. *Morgan v. Illinois*, 504 U.S. 719, 732 (1992).

The Missouri Supreme Court's ruling is reasonable in the light of the evidence in the record and is consistent with a reasonable application of prevailing law.

**Did the Trial Court Err by Admitting Evidence that Petitioner Previously Stalked Children and that Evidence was Used for Propensity Evidence?**

The essence of this claim is that the trial court was legally incorrect relative to the admission of evidence that Petitioner stalked children before the day that he committed the offense which is the subject of his claims herein. He further asserts in combination that such evidence was used to establish propensity. This claim was also raised on direct appeal to the Supreme Court of Missouri. In addressing the claim, the Supreme court stated:

> Johnson asserts that the trial court erred in overruling his defense counsel's objections to testimony of "uncharged crimes of 'stalking' children in the days preceding his crime." He argues that this evidence was inappropriate propensity evidence offered as proof that he deliberated to kill Casey, which prejudiced his defense of diminished capacity…

> …Generally, evidence, of un-charged crimes, wrongs, or acts is inadmissible for the purpose of showing the defendant's propensity to commit such crimes. *Morrow*, 968 S. W. 2d at 107…An exception to the general rule that evidence of un-charged misconduct is inadmissible "is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged." *Morrow*, 968 S. W. 2d. at 107…

> …Angel testified to events that occurred at Casey's home and on her street only two days before her murder. The evidence countered Johnson's claims that he did not deliberate before killing Casey. Angel's testimony was admissible because it helped construct a complete and coherent picture of Casey's murder by establishing the context for that offense. *See Morrow*, 968 S. W. 2d at 107.

> Moreover, Johnson fails to demonstrate there was outcome-determinative prejudice from Angel's testimony. Her testimony about seeing Johnson in the days before the murder, and the prosecutor's few remarks about that testimony, pales in the presence of the other evidence in the case. The jury heard evidence of Johnson's confession that he intended to take Casey for the purpose of having sex with her and then kill her. He admitted to taking Casey to an isolated location, burying her body, and attempting to wash evidence from his body.... There is no reasonable probability that, but for the evidence that Johnson contests, the jury would have acquitted him.

*State v. Johnson,* 207 S.W.3d at 41-43 (footnote omitted).

It is academic that issues of admissibility of evidence are state law issues and un-reviewable in

federal habeas petitions. *Clark v. Groose*, 16 F.3d 1116, 1118 (8th Cir. 1998). Federal habeas review of a due process violation from a state court conviction is "very narrow." *Newlon v. Armontrout,* 885 F.2d 1328, 1336 (8th Cir. 1989). In order to rise to a constitutional deprivation, the habeas petitioner must show that the admitted evidence so infused the trial with unfairness as to deny due process of law. *Estelle v. McGuire*, 502 U.S. 62, 75 (1991).

The decision of the Missouri Supreme Court is consistent with a reasonable application of *Estelle v. McGuire*. The ruling by the state Supreme Court is also reasonable in light of the evidence in the record as it relates to its determination that the jury could hear evidence relating to the state of mind of the Petitioner.

**Did the Prosecutor Make Improper Arguments in the Guilt and Penalty Phase of Closing Arguments?**

Petitioner asserts that the trial court erred by not admonishing the prosecutor relating to his closing that the jury should "for once" hold Petitioner responsible for his conduct. He argues that the remarks were improper in that they urged the jury to base its findings on and punish him for uncharged bad acts. He claims it was the fruit of reliance upon information obtained by mental competency examiners the use of which was prohibited as substantive evidence. This claim was considered by the Missouri Supreme Court under plain error analysis. The court observed:

> Statements made in closing argument will rarely amount to plain error, and any assertion that the trial court erred for failure to intervene sua sponte overlooks the fact that the absence of an objection by trial counsel may have been strategic in nature." *Cole*, 71 S.W.3d at 171. Plain error relief is seldom granted on assertions of error relating to closing argument because absence of an objection and request for relief during closing argument means that any intervention by the trial court would have been uninvited and may have caused increased error. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). Johnson's plain error claims relating to closing arguments need not be considered unless he shows "there is a sound, substantial manifestation, a strong, clear showing, that injustice or miscarriage of justice will result if relief is not given." *State v. Wood*, 719 S.W.2d 756, 759 (Mo. banc 1986) (internal citations omitted).

It is not necessary to determine the propriety of the prosecutor's closing remarks in this case. When manifest injustice is the standard, improper argument results in reversal of a conviction only if it is established that the argument in question had a decisive effect on the jury's determination. *State v. Wren*, 643 S.W.2d 800, 802 (Mo. banc 1983). The defendant bears the burden to prove the decisive significance. *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993). In light of the evidence presented in this case, Johnson fails to show how the prosecutor's comments had a decisive effect on the jury's verdict.

*State v. Johnson*, 207 S.W.3d at 49.

In short, the Missouri supreme Court concluded that Petitioner failed to present this claim to the trial court by way of objection or otherwise. As such the claim was not reviewed. For this claim to be reviewed here Petitioner must demonstrate good cause and actual prejudice pursuant to *Murray v. Carrier*, 477 U.S. 478 (1986). He has failed to do such in his petition for relief here.

There are other assertions related to arguments in the guilt and penalty phase of his trial which Petitioner attempts to pursue in this action. Petitioner, however, did not pursue any of those asserted deficiencies on his direct appeal from his conviction. Those complaints are procedurally defaulted due to his failure to present them to the state court. *Sweet v. Delo*, 125 F.3d 1144, 1149-50 (8th Cir. 1997). As with the above-discussed claim, a demonstration of cause and prejudice must be made before this court can consider them. Petitioner has failed to make such demonstration.

As noted previously by this court, Federal habeas review is limited and a state prisoner must fairly present his or her claims to state courts during direct appeal or in post-conviction proceedings. *Sweet*, 125 F.3d at 1149. Should the prisoner fail in raising a claim in a post-conviction relief proceeding, appeal the claim is abandoned. *Id*. at 1150 (*citing Reese v. Delo*, 94 F.3d 1177, 1181 (8th Cir. 1996)). Where a prisoner has defaulted his federal claims creating an independent and adequate state procedural bar, such as failing to raise claims on appeal, federal habeas review of the claims is barred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The procedural default may be cured if Petitioner can demonstrate legally sufficient

cause for the default and actual prejudice resulting from it, or that newly discovered evidence

proves the petitioner is probably actually innocent. *Coleman*, 501 U.S. at 750. In order to satisfy

the "cause" requirement, a petitioner must show that an "external" impediment prevented him from

presenting his claim to the state court in a procedurally proper manner. *Id*. at 753.

**Did the Trial Court Commit Error in Submitting Instructions Which Permitted the Jury to Sentence Petitioner to Death in the Absence of Proving Beyond a Reasonable Doubt that the Mitigating Factors Outweighed the Aggravating Factors**?

The focus of Petitioner's attack here is Instruction number 24 and number 26. In addressing

this issue on direct appeal the Missouri Supreme Court concluded:

> Johnson complains that the instructions were given in error and prejudiced him because they failed to tell the jury wh-at to do if they were tied or not
unanimous
> when weighing aggravators and mitigators. He fails to demonstrate that the instructions were insufficient in this regard.

> Instruction 24 was patterned after MAI–CR3d 314.44. It stated in relevant part:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted ... exists, you must then determine whether there are facts and circumstances in aggravation of punishment.

> It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life ... without eligibility for probation or parole.

> Instruction 26 was based on MAI–CR3d 314.48. It stated in relevant part:

> If you unanimously decide that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, then the defendant must be punished for the murder ... by imprisonment for life ... without eligibility for probation or parole....

> If you do unanimously find the existence of at least one statutory aggravating circumstance beyond a reasonable doubt ... and you are unable to unanimously find that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, but are unable to agree upon the

punishment, your foreperson will complete the verdict form.... [And] you must answer the questions on the verdict form....

Johnson also asserts that these instructions prejudiced him because they failed to inform the jury about the proper burden of proof for weighing mitigators against aggravators. He argues that under section 565.030.4(3), the third of four steps for determining whether a defendant is eligible for the death penalty, the jury must be instructed that the State bears the burden of proving beyond a reasonable doubt that the mitigators are insufficient to outweigh any aggravators found.

This Court has repeatedly rejected the claim that section 565.030.4(3) requires the jury to make a finding beyond a reasonable doubt. State v. Gill, 167 S.W.3d 184, 193 (Mo. banc 2005) ("Although section 565.030.4 expressly requires the jury to use the reasonable doubt standard for the determination of whether any statutory aggravators exist, the statute does not impose the same requirement on the determination of whether evidence in mitigation outweighs evidence in aggravation."); *Glass*, 136 S.W.3d at 521; see also *Storey v. State*, 175 S.W.3d 116, 156–57 (Mo. banc 2005).

## 2. Plain Error Review

Johnson further requests plain error review of Instructions 24 and 26 on his claims that the instructions were given in error because section 565.030.4(3) requires that only aggravators "found" by the jury be considered and because section 565.030.4(3) does not require the jury to "unanimously" find that mitigators outweigh aggravators. An instructional error rises to the level of plain error only when the appellant demonstrates that the instruction so misdirected or failed to instruct the jury that it is apparent that the error affected the jury's verdict. *Baker*, 103 S.W.3d at 723. Johnson fails to meet this burden.

This point is denied.

*State v. Johnson*, 207 S.W.3d at 46-48 (footnote omitted).

As the record demonstrates this claim is not subject to review by this court as Petitioner defaulted on the claim in state court. The Missouri Supreme Court concluded that instructions numbered 24 and 26 were proper as given under Missouri law. This court will not review pursuant to *Estelle v. McGuire,* supra.

In addition, Petitioner does not demonstrate how the complained of instructions violates his constitutional rights under the eighth or fourteenth amendment. The position is not alleged in the

petition and it is barred by default.

**Are Statutory Aggravators Required to be Set Out in the Indictment or Information?**

Petitioner complains that the death penalty should have been precluded because the amended information filed by the state was insufficient. The state failed to include the statutory aggravators when they filed the amended information which was the document upon which he was tried, convicted, and sentenced to death. Petitioner relies upon *Apprendi v. New Jersey*,530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) in support of his position for review. The Supreme Court of Missouri pondered this claim and concluded:

### H. Statutory Aggravating Circumstances

Johnson contends that the trial court erred in overruling his motion to quash the information or, alternatively, preclude the death penalty because the State's amended information was insufficient in that it failed to plead any statutory aggravators. Johnson's claim is based on his belief that *Apprendi v. New Jersey*,530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), require statutory aggravators to be included in the charging document so that the offense of aggravated first degree murder punishable by death, is distinguished from the offense of non-aggravated first degree murder which would have a maximum sentence of life without parole.

### 1. Inclusion in Information Not Required

This Court has repeatedly rejected claims that the information or indictment must include statutory aggravators. *See, e.g., Gill*, 167 S.W.3d at 193–94; *Glass*, 136 S.W.3d at 513; *Edwards*,116 S.W.3d at 543–44 (Mo. banc 2003); *State v. Gilbert*, 103 S.W.3d 743, 747 (Mo. banc 2003); *State v. Tisius*, 92 S.W.3d 751, 766–67 (Mo. banc 2002); *State v. Cole*, 71 S.W.3d 163, 171 (Mo. banc 2002). "Missouri's statutory scheme recognizes a single offense of murder with a maximum sentence of death, and the required presence of aggravating facts or circumstances to result in this sentence in no way increases this maximum penalty." *Gill*, 167 S.W.3d at 194.

### 2. Notice is Sufficient

Section 565.005.1 requires the state to give the defendant notice "[a]t a reasonable time before the commencement of the first stage of [a capital trial]" of the statutory aggravating circumstances it intends to submit in the event the defendant is

convicted of first degree murder. "Notice of statutory aggravating circumstances stands in lieu of charging them in the information or indictment." *Glass*, 136 S.W.3d at 513. Johnson does not allege that he had insufficient notice of the statutory aggravating circumstances in this case.

The trial court did not error in overruling Johnson's motion to quash the information.

*State v. Johnson,* 207 S.W.3d at 48 (footnotes omitted).

The holding in *Apprendi* is clear and unambiguous that "any fact other than prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 466. *See also Booker*, 543 U.S. at 244; *Ring*, 536 U.S. at 589. As much as Petitioner may argue that point here the argument is misplaced. As the Respondent has noted, the aggravating circumstances about which Petitioner complains do not increase the maximum penalty for first-degree murder. The penalty for murder in the first degree in the state of Missouri is either life imprisonment without the possibility of probation or parole or death. §565.020(2), RSMo (1990).

The decision of the Missouri Supreme Court was reasonable under applicable law and not contradictory. Aggravating factors are not elements of the charge. Petitioner had sufficient notice of the charge. The evidence in the record supports the ruling,

This claim is denied.

Petitioner also fled a pro se post-conviction relief motion pursuant to Missouri Supreme Court rule 29.15 on March 16, 2007. After motion counsel entered an appearance on behalf of Petitioner, an Amended Motion for post -conviction relief was filed on July 5, 2007. This petition set out claims relating to Petitioner being the victim of ineffective assistance of counsel. Petitioner asserted trial counsel was ineffective for failing to investigate and present social media history; trial counsel was ineffective in failing to consult with a neuropsychologist and present brain damage evidence;

counsel was ineffective in failing to present childhood abuse and neglect, and limited intelligence evidence; trial counsel was ineffective in failing to rebut expert testimony that Petitioner's behavior resulted from drug use; trial counsel was ineffective for failing to suppress his post-arrest statements and for failing to investigate and present evidence of his low IQ. The motion court granted an evidentiary hearing which spanned a period of time from November 30, 2009 , December 2, 2009, July 23, 2010, concluding with the submission of deposition testimony on behalf of the Petitioner and on behalf of the prosecution.

On April 5, 2011 the motion court entered its Findings of Fact, Conclusions of Law, Order, Judgment, and Decree of Court denying the relief sought by Petitioner. On  May 13, 2011 Petitioner filed his Notice of Appeal to the Missouri Supreme Court.. On November 20, 2012 The Missouri Supreme Court rendered its opinion affirming the denial of relief by the motion court.[2]

Petitioner now raises these points of concern before this court in his Section 2254 Death Penalty Habeas action. There are limitations imposed upon the court in review of these matters. In asserting  a case involving allegations of ineffective assistance of counsel a petitioner must show both that: 1) his counsel's performance was objectively unreasonable, and 2) he was prejudiced as a result of his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984).  Courts reviewing counsel's performance must be "'highly deferential' in assessing whether counsel's course of conduct could be considered a sound trial strategy rather than an error and must 'indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (*quoting Strickland*, 466 U.S. at 689). The possibility of a different result must be substantial, not just conceivable. *Harrington*, 131 S. Ct. at 792. A petitioner must meet both the performance and the

prejudice conditions to prevail on an ineffective assistance claim, "and the court need not address both if one condition is insufficiently established." *James v. Iowa*, 100 F.3d 586, 589–590 (8th Cir. 1996).

The court's review of claims of ineffective assistance of counsel in habeas review is "doubly" deferential, *Harrington*, 131 S. Ct. at 788. As the standard for competence under *Strickland* is a general standard, "the range of reasonable application is substantial." *Id*. at 788. *See also Woodford v. Visciotti*, 537 U.S. 19 (2002) (*per curiam*) (reversing federal court's conclusion that state court's finding of lack no prejudice was unreasonable).

## Was Trial Counsel Ineffective in Failing to Investigate and Present Social and Medical History?

The focus of this asserted claim lies in its significance in the penalty phase of the trial as it relates to a failure by trial counsel to investigate and present that which Petitioner asserts to be a better strategy. In some ways this is akin to reversing the field in the rear view mirror so that what is behind you is now in front of you allowing you to see every move formerly in the mirror and now on the road ahead. The record of proceedings indicates that trial counsel did indeed investigate relative Petitioner's past and present social and mental history. Relevant records were reviewed and many mental health experts were consulted.

This issue was considered by the post-conviction motion court. That court concluded the claim was meritless. In reaching that conclusion the motion court reviewed, discussed and analyzed the evidence in consideration of the claim and noted:

> Dr. Beaver testified that he is a licensed psychologist and spends approximately 60% of his time evaluating and treating patients for both psychological and neuro-Psychological issues. The remaining 40% of his time he does forensic evaluations in both civil and criminal cases. …………Dr. Beaver testified that he has been qualified to testify

---

[2] This opinion was issued by the Honorable George W. Draper,III. Concurring in the opinion were Chief Judge Teitleman, and Justices Russell, Breckenridge, Fischer, and Stith.

in more than twenty (20) states but this case is his first in Missouri. The doctor admitted that he is not a certified forensic examiner in any State. In death penalty cases, he is retained 95% of the time by the defense. In all but two (2) of those death penalty cases, he has testified on behalf of the defendant. In one such case he testified for the prosecution regarding competency to stand trial, and in the other he gave testimony as a witness.

Dr. Beaver testified that on this case he received compensation at a rate of $250 to $300 per hour for consultation, record review, and evaluation time. His rate for courtroom time is $400 per hour. Prior to his testimony in this case, he estimated he had received approximately $20,000 in compensation from the Office of Public Defender but that did not include his travel costs and expenses for four (4) trips to Missouri related to the case.

Dr. Beaver received sixteen (16) volumes of documents and records from post-conviction counsel for review. In addition to those records, on February 25, 2007 Dr. Beaver travelled to the Potosi Correctional Center to interview and test Movant. He returned the following day, and Movant refused to see him. Dr. Beaver later returned for a day in April 2007, to conclude his testing. During testimony, he described fifteen (15) testing measures he conducted during those two (2) visits and his interpretation of the results. He admitted that the psychotropic medications Movant was taking during testing could lower his test scores as well as lack of sleep the night before testing. Although he did not diagnose malingering on any of his testing, he did acknowledge Movant's history of malingering on previous psychological testing. Dr. Beaver conceded that it would not be helpful to his hope for a new trial for Movant to do well on the intelligence tests being administered. He agreed that inmates claiming mental illness can be segregated into an infirmary or separate housing unit. Dr. Beaver stated that his testing confirmed that Movant is not mentally retarded. He indicated that Movant's scores could be consistent with his previously diagnosed learning disorders as well as the diagnosis of schizoaffective disorder. Dr. Beaver indicated he administered a problem solving test called the Wisconsin Card Sorting test. He described a portion of this test as one of inductive reasoning and indicated Movant was within a normal range.

The motion court continued by stating:

This Court has thoroughly reviewed the reports filed by Dr. Delany Dean, Dr. Byron English, Dr. Stephen Becker and Dr. John Rabun as well as their extensive trial testimony. These records reflect a consistent diagnosis of Movant with schizophrenia or schizoaffective disorder and only a disagreement between the witnesses as to the effect of the mental illness on his mental state. Dr. Dean was of the opinion that the mental illness was to such a degree that Movant was not capable of deliberating on his crime (diminished mental capacity) but was still responsible for his actions. Dr. Rabun diagnosed schizophrenia but opined that Movant was capable of deliberation. Drs. Becker and English agreed that Movant suffered from schizoaffective disorder, but concluded that he was responsible for his actions and capable of deliberation. Based upon Movant's statements to them, Becker and English concluded that Movant's alcohol and drug intoxication was [sic] the cause of his hallucinations, if they occurred.

This Court finds that trial counsel was not ineffective in soliciting the testimony of Dr. Beaver. Trial counsel made reasonable efforts to investigate the mental status of Movant, as he was examined by Dr. Dean, Dr. Rabun, Dr. English, and Dr. Becker, not to mention the countless mental health professionals who examined him in his previous hospitalizations. Trial counsel had no reason to dispute the findings of these experts. Not one of these experts suggested that Movant suffered from brain damage or hinted that such a condition influenced his behavior during the abduction and murder of Casey Williamson.

Dr. Stewart received fourteen (14) volumes of documents and records from post-conviction counsel for review. In addition to those records and his single interview with Movant at the Potosi Correctional Center, he also conducted a telephone interview with Pamela Strothkamp. He indicated that he conducted no independent investigation beyond the review of the records he had been provided by Movant's attorneys. The records reviewed appeared to be the same 2,100 pages of documents provided to Dr. Dean, Dr. English and Dr. Becker along with penitentiary records after Movant's conviction and sentencing, additional interviews of Movant by post-conviction mitigation workers and other assorted notes provided by post-conviction counsel.

The motion court went on to observe:

As part of his testimony, Dr. Stewart discussed the previous psychiatric hospitalizations contained in Movant's records. Each of these hospitalizations had been discussed during trial testimony. He noted that each hospitalization contained a diagnosis of drug abuse. Dr. Stewart explained Movant's history of sexual abuse, physical abuse, suicide attempts, and school difficulties including his diagnosed learning disability. He recounted Movant's difficulties at home as well as his extensive drug abuse. Dr. Stewart examined Movant's history of hallucinations. He agreed hallucinations or other psychotic symptoms will present the same way regardless of etiology. That not even an expert can tell the difference between drug induced hallucinations or mental health hallucinations. Dr. Stewart acknowledged that, prior to the crime, Movant had never described to any mental health expert hallucinations containing a sexual content or hallucinations telling him to hurt someone other than himself.

(Ex. E, pg. 624-639).

On appeal to the Missouri Supreme Court of this adverse ruling that court concluded:

In a death penalty case, counsel is expected to "discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). This includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id*. Counsel's duty is to "conduct a reasonable investigation and to present evidence of impaired intellectual functioning ...." *McLaughlin v. State*, 378 S.W.3d 328, 2012 WL 2861374 (Mo. banc 2012) (quoting

*Hutchison v. State*, 150 S.W.3d 292, 297 (Mo. banc 2004)). However, counsel "is not ineffective for failing to shop for an expert that would testify in a particular way." *Glass v. State*, 227 S.W.3d 463, 484 (Mo. banc 2007) (quoting *Edwards v. State*, 200 S.W.3d 500, 518 (Mo. banc 2006)). The "duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Strong v. State*, 263 S.W.3d 636, 652 (Mo. banc 2008) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)).

In this case, Movant's counsel spoke to at least mental health experts and reviewed extensive mental health and school records. One of the mental health experts met with Movant on multiple occasions, specifically attempting to determine whether Movant suffered from a mental disease or defect which would relieve him of responsibility for his conduct. Counsel further investigated the possibility that Movant suffered from mental retardation. Counsel presented evidence by mental health experts regarding Movant's mental and social development. One of the evaluations contained some neuropsychological testing, and it did not reveal results that would be suggestive of significant neuropsychological impairment.

Movant's counsel was not ineffective for failing to call a neuropsychologist after extensively investigating Movant's mental health. Counsel specifically investigated the possibility Movant suffered from some mental disease or defect which would relieve him of responsibility for his conduct. Further, counsel relied upon the evaluation of one of the mental health experts who conducted some neuropsychological testing, and those findings did not suggest a significant neuropsychological impairment.

*Johnson v. State,* 388 S.W.3d 159, 165 (Mo. banc 2012).

Under *Rompilla v. Beard*, 545 U.S. 374, 381-82 (2005), when judging counsel's investigation, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made, and by giving a heavy measure of deference to counsel's judgments. The record reflects that counsel engaged in a reasonable amount of investigation into Petitioner's social and medical history. *Id.*

The record is replete with the extensive work by trial counsel on this point. Counsel hired Dr. Dennis Keyes to review Johnson's records and spoke to Dr. Keyes regarding review of records relating to Petitioner. Trial counsel reviewed relevant records and consulted with numerous mental health experts.

Dr. Rabun and Dr. Dean examined the Petitioner. Dr. Rabun examined his mental state and Dr. Dean concluded Petitioner was not capable of deliberation based on his examination. As is so precisely noted by Respondent, trial counsel and mitigation experts reviewed school, hospital, jail, and prison records. (Ex. E, pg. 396, 411, 421-26, 446-47, 452-54, 463, 488). They interviewed family members and teachers, deposed witnesses, and consulted with mental health experts. (Ex. E, pg. 396, 411, 421-26, 446-47, 452-54, 463, 488). Counsel called eight witnesses during the guilt phase of Johnson's trial to testify regarding the matters he now asserts were not investigated. (Ex. E, pg. 396, 411, 421-26, 446-47, 452-54, 463, 488). In addition, counsel called seventeen witnesses to testify about their conclusions of Johnson's social and medical history during the penalty phase of the trial. (Ex. E, pg. 396, 411, 421-26, 446-47, 452-54, 463, 488).

Applying *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984), the performance of counsel was not deficient and did not prejudice Petitioner. As hindsight is discounted in evaluating the performance of counsel, likewise, is trial counsel's ability to foresee the future and ascertain what strategy a client might perceive as a better one than the one utilized at the time.

**Was Trial Counsel Ineffective in Failing to Consult with a Neuropsychologist and Present Brain Damage Evidence?**

In reviewing the record, the essence of this claim is that trial counsel did not call Dr. Beaver to testify regarding certain findings and conclusions. This claim was raised before the post-conviction hearing judge and Dr. Beaver testified at the hearing regarding this claim. Specifically, Dr. Beaver testified that his opinion was based upon events that transpired after the trial.

The post-conviction hearing judge ruled that:

> Movant's allegation that counsel failed to investigate and provide an opinion regarding brain damage is refuted by the record. Dr. Dean, Dr. English and Dr. Becker indicated in their reports and testimony an extensive list of materials and witnesses they had considered. From their reports and testimony, it is clear that they each investigated the potential of brain damage. These doctors reviewed

the same records and interviewed many of the witnesses called at trial. The voluminous records presented at the evidentiary hearing were reviewed by these experts prior to trial. The trial record refutes Movant's claim that the extent of trial counsel's investigation in this case was unreasonable, considering "all the circumstances" as required under Strickland. Claim 9(A) is denied.

Trial counsel testified that they considered and discussed retaining a neuropsychologist. The strategy of retaining a neuropsychologist was disclosed with Dr. Dean and Dr. Draper. Although they could not remember a specific strategic reason for not consulting a neuropsychologist, both trial counsel agreed that Dr. Dean's report concluded that her testing "did not yield scores suggestive of significant neuropsychological impairment (brain damage)" and they relied upon the mental health expert they had retained to help them recognize if there was anything else the defense needed to do in this regard, or, more fundamentally, any experts they needed to hire. Trial counsel agreed that Dr. Dean reached this conclusion in her report after examining Movant at least two (2) times after having discussed hiring a neuropsychologist to examine him. In addition, trial counsel consulted with Dr. Dennis Keyes.

The post-conviction hearing court continued to note:

Counsel's failure to recall the reason does not overcome the presumption that the decision not to pursue a neuropsychologist was sound trial strategy, especially as here, where the record demonstrates Dr. Dean's further evaluations of Movant and written conclusion regarding brain damage as plausible reasons for their [sic] decision. Based upon this evidence, this Court may readily infer the reason for not retaining a neuropsychologist was based upon trial counsel's reliance on the findings of their experts they had retained.

(Ex. E, p. 627-628).

On appeal to the Missouri Supreme Court the issue was likewise considered and ruled upon.

That court concluded:

Assuming counsel were ineffective for failing to present the testimony of organic brain damage, Movant was not prejudiced. To demonstrate a claim of ineffective assistance of counsel for failure to locate and call an expert witness, Movant must show that: "(1) such an expert witness existed at the time of trial; (2) the expert witness could be located through reasonable investigation; and (3) the expert witness's testimony would have benefited the defense." *Zink*, 278 S.W.3d at 179. "Failure to present evidence that is cumulative to that presented at trial does not constitute ineffective assistance of counsel." *McLaughlin*, 378 S.W.3d at 343. Here, Movant failed to show the proffered testimony by Dr. Beaver would have benefited his defense. Dr. Beaver never made a diagnosis, prepared a formal report, nor made any other conclusion that was not supported by other evidence

presented by Movant's counsel.

*Johnson v. State*, 388 S.W.3d 159, 165-166 (Mo. banc 2012).

The record submitted to this Court is consistent with the finding of the post-conviction hearing court and the ruling by the Missouri Supreme Court. Counsel spoke with Dr. Dean about the need for neuropsychological testing and Dr. Dean conducted the Stroop test on Petitioner in order to look for neuropsychological impairment. (Ex. E, pg. 375, 520). Dr. Dean's overall evaluation of Petitioner included neuropsychological testing. (Ex. E, pg. 373, 376, 491, 498). There was no evidence that Petitioner suffered from brain damage. (Ex. E, pg. 375, 455).

Trial counsel was reasonable in his performance. Dr. Dean performed neuropsychological testing and Petitioner has not demonstrated how the testing was unreliable. An expert was solicited and retained to perform neuropsychological testing and search for brain damage. There is no objective unreasonableness.

There was no prejudice by the performance of counsel. Trial counsel did what a reasonable trial counsel would have done and that is rely upon the experts. Twenty-five witnesses were called by trial counsel. Eight of those witnesses were called in the guilt phase. Seventeen were called during the penalty phase. One of the witnesses, Dr. Rabun, testified to Petitioner's history of treatment for psychological problems beginning at age thirteen. (Ex. I, pg. 1454). He went on to testify about how Petitioner was hospitalized for alcohol, drug, and mental illness issues. (Ex. I, pg. 1454, 1458). Dr. Rabun outlined Petitioner's lengthy history of mental illness. (Ex. I, pg. 1455).

The assertion that Dr. Beaver could have or should have been called at trial is greatly erroneous and misplaced. Dr. Beaver testified at the Rule 29.15 hearing that his opinion was based on events that occurred after the trial, that it was based upon Dr. Stewart's post-trial psychological evaluation and Dr. Kraushaar's 2007 memory testing. (Ex. J, pg. 603-04, 621, 628, 633, 660), and

his review of  psychological records from the time Petitioner spent in the Department of Corrections after trial. (Ex. J, pg. 603-04, 621, 628, 633, 660).

Since the performance of counsel is based upon conditions as they existed at the time of trial and the asserted conclusions of Dr. Beaver could not have been available at the time of trial, and experts were utilized in the pursuit of similar or same testimony, counsel cannot be said to be ineffective.  *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984).

**Was Trial Counsel Ineffective in Not Presenting Childhood Abuse and Neglect, and Limited Intelligence Evidence?**

Petitioner asserts that his trial counsel should have, but failed to, present evidence, referencing a teacher named Ms. Strothkamp, relating to Petitioner being abused and neglected as a child as well as having limited intelligence. Reviewing the record submitted with the filings establishes that the evidence Petitioner claims was not sought out and presented by trial counsel was in fact presented by trial counsel.

When this claim was reviewed with a hearing by the post-conviction relief court, that Missouri court found:

> In considering the testimony of Ms. Strothkamp, the only matter clearly proven was the witness' willingness to testify. Allegations in a post-conviction motion are not self-proving. Movant's witness, Lisa McCulloch, testified that she was appointed to work on his case in 2003, and was assigned by the trial attorneys to investigate the social history and background of Movant. She constructed a list of more than sixty (60) witnesses she attempted to contact including Ms. Strothkamp. Ms. McCulloch indicated she left at least two (2)  messages at listings for Strothkamp but never heard back from her. Ms. McCulloch  testified she did not pursue the witness, because Movant said "don't call her."

> Ms. Strothkamp testified at the evidentiary hearing that she was Movant's sixth grade special education teacher at North Jefferson Middle School from October or November 1991 through May of 1992. The record reflects that Movant's trial counsel and Ms. McCulloch interviewed Movant's special education teacher in seventh and eighth grade, Jingjia Hu, another eighth grade special education teacher David Staat, his first grade teacher Barbara Johnson, his Valley

Park Elementary School teacher Laura Knies, and Mike Murphy, a classmate of Movant's in sixth, seventh and eighth grade. During Movant's trial, the jury heard testimony from Shirley McCulloch, Movant's kindergarten teacher at Keysor Elementary school, Christopher Reeves, an assistant principal at North Jefferson Middle School, Linda White, Movant's eighth grade special education teacher at Northwest Valle Middle School in 1993, Karen Gilbert, Movant's counselor at Northwest Middle School in 1993, and Susan Betts, Movant's seventh grade teacher. In addition, Movant's trial counsel presented the testimony of nine (9) relatives who described his childhood in great detail. Trial counsel also presented the testimony of human development expert Wanda Draper who discussed Movant's entire lifetime prior to the murder. Each of these witnesses provided consistent testimony favorable to Movant during his trial.

Based upon the evidence adduced at the post-conviction hearing and the testimony of the numerous of witnesses called at trial, as well as Movant's instructions not to contact Ms. Strothkamp, this Court finds that trial counsel was not ineffective in failing to investigate and locate this witness for trial. From the testimony of Ms. McCulloch, it is clear that reasonable attempts were made to locate Ms. Strothkamp and further attempts were not made due to specific instructions by Movant. No evidence has been produced to indicate that this decision was unreasonable. The duty to investigate does not force lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed. 360 (2005).

The post-conviction hearing court went on to consider and evaluate the testimony of Ms. Strothkamp noting:

In considering the testimony of Ms. Strothkamp, it is clear that her testimony would not have provided Movant with a defense to the charges. Her complete contact with Movant occurred between November of 1991 and May of 1992, more than ten (10) years prior to the murder of Casey Williamson. Although Ms. Strothkamp attempted to provide the Court with a diagnosis of Movant as suffering from auditory processing disorder, she was clearly not qualified to make such an assertion. Her time spent with Movant was her first teaching experience after receiving her certification to teach. She is not a psychiatrist or psychologist and presented no evidence of competence to make such a diagnosis.

While assessing her credibility as a witness, it was noted that she appeared emotionally attached to Movant which caused her to be argumentative in her testimony. Her claims of clear memory of contact with Movant eighteen (18) years prior to her testimony strained her believability. Absent from the records presented during the hearing were the IEP she claimed to have prepared in 1992 and any indication that alleged hotline calls were made to any state agency regarding Movant. When confronted with other records, she appeared to attempt to make Movant look worse than those counselors, principles, and teachers who testified

at trial. The revelation that Ms. Strothkamp travelled to the Missouri Department of Corrections in Potosi three (3) times to visit Movant after having no contact with him for more than fifteen (15) years indicates an obvious bias severely weakening her credibility as a witness.

(Ex. E, pg. 631-633).

Petitioner appealed the adverse ruling of the post-conviction hearing court to the Missouri Supreme Court. Considering the claim on the merits that Court found:

"The choice of witnesses is ordinarily a matter of trial strategy and will not support an ineffective assistance of counsel claim." *Strong,* 263 S.W.3d at 652. As previously noted, while counsel had a duty to investigate, this duty "does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* (quoting *Rompilla,* 545 U.S. at 383, 125 S.Ct. 2456). To succeed on a claim of ineffective assistance of counsel for failing to call a witness, the movant must prove: "(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." *Vaca*, 314 S.W.3d at 335-36 (quoting *Hutchison*, 150 S.W.3d at 304).

Movant's counsel's investigator (hereinafter, "Investigator") knew Teacher was his sixth-grade teacher. Investigator left messages with two different telephone listings for Teacher's name. However, Investigator did not follow up with contacting Teacher because Movant told Investigator to not contact Teacher. Teacher was not interviewed because Movant claimed she did not like him and would be unhelpful. In researching Movant's social history, Investigator attempted to contact sixty-six witnesses. Movant's counsel called multiple teachers and educational professionals to testify regarding Movant's learning disabilities, his subaverage intellectual functioning, his limited education, and his special education classes during both the guilt and penalty phases of trial.

Movant's counsel was not ineffective for failing to call Teacher to testify. Movant's educational and social history was examined thoroughly by counsel and presented to the jury in the guilt and penalty phases of trial. Teacher's proffered testimony would have been cumulative of the testimony of other witnesses. *Clayton v. State*, 63 S.W.3d 201, 209 (Mo. banc 2001); *Forrest,* 290 S.W.3d at 711. Further, Teacher would not have provided Movant a viable defense.

*Johnson v. State*, 388 S.W.3d 159, 166 (Mo. banc 2012).

Under *Strickland v. Washington*, 466 U.S. 668 (1984), Petitioner must show a deficient performance by counsel which results in prejudice. Trial counsel can be found deficient for failing to adhere to the norms of adequate investigation. *Id*. The reasonableness of counsel's performance is to be determined by considering all of the circumstances. *Smith v. Mitchell*, 348 F.3d 177, 199 (6th Cir. 2003). Prejudice, in cases involving a death sentence, requires petitioner show a reasonable probability that, absent error, the fact finder would have concluded the balance of aggravating and mitigating circumstances did not warrant death. *Id*.

Here, the record reflects trial counsel presented much evidence, of varying kinds and sources, of Petitioner's childhood abuse, neglect, and limited intelligence. His teacher, Susan Betts, as well as the principal, Chris Reeves, testified first-hand regarding Petitioner's learning disability and his difficulties in school relating to a limited intelligence. (Ex. I, pg. 2164 and Ex. I, pg. 2148, respectively).

Experts testified regarding the history of abuse and neglect relating to the Petitioner. Dr. Rabun testified at Petitioner's trial and detailed Petitioner's learning disability and how Petitioner was sexually molested as a child. (Ex. H, pg. 1459). Katie Johnson, sister of Petitioner, also testified to seeing Petitioner sexually abused as a four-year-old child. (Ex. I, pg. 2036). She went on to testify to seeing "the outcome" of his having been sexually molested. (Ex. I, pg. 2039-40).

Dr. Draper testified about reviewing records from Petitioner's entire life and neglect as an infant. (Ex. I, pg. 2077, 2079-81, 2084-88, 2092-94, 2096-2106). She went on to outline his history of physical, verbal, and sexual abuse, his learning disability, how he struggled in school, and how he was sexually assaulted in prison. (Ex. I, pg. 2077, 2079-81, 2084-88, 2092-94, 2096-2106). Dr. Draper testified that Johnson did not develop normally and never fully matured. (Ex. I, pg. 2083, 2085, 2089, 2092, 2099, 2101-2012.

The performance of trial counsel cannot be objectively unreasonable since counsel brought out those aspects of evidence that Petitioner asserts were not produced at trial. In addition, there was no prejudice to Petitioner by the performance of trial counsel. Trial counsel testified at the post-conviction motion hearing that the decision not to present more evidence on this subject was a strategic choice designed not to overplay the issue. (Ex. E, pg. 527). Counsel testified to an awareness of further evidence of childhood abuse, neglect, and low intelligence, but to not wanting the jury to "get sick and tired of it." (Ex. E, pg. 527). There is no prejudice in not presenting cumulative and redundant evidence. *Strickland v. Washington,* 466 U.S. 668, 687–688 (1984).

The decision of the post-conviction motion court is consistent with a reasonable application of *Strickland v. Washington*. Likewise, the decision of the Missouri Supreme Court is consistent with a reasonable application of *Strickland v. Washington* and is reasonable in light of the evidence in the record.

**Was Trial Counsel Ineffective in Failing to Rebut Expert Testimony that Johnson's Behavior Resulted from Drug Use?**

Petitioner asserts that when the State presented testimony to rebut his expert testimony relating to his psychiatric history and defense, trial counsel should have presented more testimony to contradict the testimony offered by the State. This claim was considered upon hearing by the post-conviction motion court. The record discloses that the post-conviction court found:

> In considering this claim, it bears repeating that "[G]enerally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable." *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1977). "[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." *Id.* at 268; as quoted in *Johnson v. State*, ___ S.W.3d ___, SC90582, (slip op. at 5, Mo. banc, March 1, 2011). The mere fact that defendant was able to later obtain an expert that would have provided an opinion supporting the defense does not establish that counsel could have found such an expert at the time of trial or that they were ineffective for failing to do so. *State v. Ashley*, 940 S.W.2d 927, 933-34 (Mo. App. 1997). "While defense counsel could have continued to

consult additional experts in the hope of finding one that might support [the defense], counsel is not required to consult additional experts in the hope of finding one who might provide more helpful testimony. *Worthington v. State*, 166 S.W.3d 566, 575 (Mo. banc 2005).

In support of this claim, Movant presented the testimony of Dr. Pablo Stewart, a licensed psychiatrist hired by post-conviction counsel from the State of California.

Dr. Stewart stated that Movant was unable to give him any detail about what he recalled about the crime because, "he became increasingly psychotic and disorganized and was unable to tell me much about it." Movant's inability to provide Dr. Stewart with details regarding his memory of the homicide in his interview is consistent with Dr. Beaver's interview but inconsistent with his statements to every other mental health examiner who has evaluated him. Although Dr. Stewart was very critical of Drs. Dean, English or Becker, he stated that he never attempted to speak with any of the previous mental health experts who evaluated Movant within months of his crime or prior to his conviction and sentence of death. Dr. Stewart praised the report of Dr. Rabun but did not comment on Dr. Rabun's conclusion that Movant suffered from schizophrenia or his testimony that based on his evaluation, Movant had the ability to deliberate.

In arriving at his conclusion, Dr. Stewart made clear that he rejected any self-report of any information Movant provided to the police or other examiners as unreliable due to his mental illness. Dr. Stewart disregarded all of Movant's claims of drug use despite his consistent story of heavy drug use during days and weeks prior to the murder. Dr. Stewart accepted Movant's claims of hallucinations as they had been consistently reported throughout the records he was provided. Dr. Stewart provided a diagnosis of Movant as suffering from chronic psychotic disorder not otherwise specified, mood disorder not otherwise specified, post-traumatic stress disorder, and other cognitive disorders. Based upon this diagnosis, Dr. Stewart was of the opinion that Movant was not responsible for his criminal conduct and was incapable of knowing or appreciating the nature or quality or wrongfulness of his conduct. In addition, he opined that at the time of the murder Movant was under the influence of extreme mental and emotional disturbance and inhibited the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law.

Movant's arguments concerning Dr. Dean's testimony versus Dr. Stewart's testimony rather plainly reveal that he does not appreciate that the Strickland standard is concerned with the performance of counsel, not the "validity" of the testimony of an expert witness. Movant's burden is to show that counsel's performance was deficient, not a witness's. *Strickland,* 466 U.S. at 687. While the performance of an expert witness may be relevant to an ineffective assistance of counsel claim, it is relevant only insofar as it bears upon the question whether the attorney's performance was deficient. *Id*. *Strickland* instructs that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's performance at the time. *Strickland*, 466 U.S. at 689.

The reasonableness of trial counsel's investigation of Movant's mental state is not determined by whether they found the "best" expert, but whether in light of the evidence before them, they conducted a sufficient inquiry into a psychiatric defense. Here, trial counsel utilized an expert they had both successfully used in the past, an expert they believed to be honest; an expert they believed had the background and experience to explain a difficult defense to a jury, and an expert they believed would have great credibility with the jury.

Movant's ineffectiveness of counsel claim fails because he has not demonstrated that his trial counsel knew or would have learned after reasonable investigation that Dr. Dean's testimony was below the standard of professional care or unsuited for Movant's case. This Court has not been presented with any credible evidence that Dr. Dean was not qualified to render her opinion as to Movant's mental state. The fact that Dr. Stewart took a different approach or disagreed with her findings is insufficient to put counsel on notice that Dr. Dean may not be an appropriate expert on Movant's case. Dr. Stewart's testimony merely shows that experts disagree on Movant's diagnosis, not that Dr. Dean's testimony was incorrect.

This court regards Dr. Dean's testimony to be more reasonable given the facts established at trial than that of Dr. Stewart. Dr. Dean's diagnosis was consistent with Becker, English, Rabun and numerous others who had evaluated Movant prior to his crimes. Dr. Stewart's evaluation, while certainly more expensive, took place more than four years after Casey Williamson was murdered and only after Movant had spent two (2) years on death row.

(Ex. E, p. 637-641).

Petitioner also presented this issue to the Missouri Supreme court on appeal of the denial of his post-conviction relief motion. Upon consideration of the issue the Missouri Supreme Court ruled:

Movant presented the expert testimony at trial, establishing his defense, and expounding upon his psychiatric history for the jury. Then, Witness was called by the State to rebut the testimony presented by Movant's expert witnesses. Movant now asserts his trial counsel should have presented additional testimony to contradict the testimony provided by Witness. Movant believes there should have been additional testimony to demonstrate that mental illness and substance abuse are interrelated, hallucinations are real whether induced by drugs or a psychotic illness, command hallucinations are not always followed immediately, and a personality diagnosis is inappropriate when one suffers from a psychotic disorder. Essentially, Movant claims his trial counsel should have called additional witnesses to rebut the testimony of the State's rebuttal

witness.

> Movant's claim fails because he does not identify a witness whom his trial counsel should have known at the time of trial, nor can Movant demonstrate that the witness would have produced a viable defense. *Vaca*, 314 S.W.3d at 335-36. Further, some of the testimony that Movant stated the unknown witness would provide is cumulative to the testimony presented by his expert witness. *Clayton*, 63 S.W.3d at 209. Trial counsel was not ineffective for failing to call another expert to testify to rebut the State's rebuttal witness.

*Johnson v. State*, 388 S.W.3d 159, 166 (Mo. banc 2012).

On this ineffective assistance of counsel claim Petitioner has asserted trial counsel to be deficient in failing to call certain witnesses or put on certain evidence to obviate or rebut certain evidence or testimony introduced by the State. As respondent correctly argues, the gravamen of Petitioner's complaint is in fact evidence that was presented by the State to rebut evidence put on by the defense. Dr. Delaney was presented by defense counsel in the guilt phase of the trial and testified regarding extensive drug usage by Petitioner. Dr. Delaney testified that Petitioner told her that he had used meth twenty -four to seventy -two hours before the murder. (Ex. I, pg. 1620, 1622). Dr. Delaney went on to distinguish Petitioner's mental illness from his substance abuse. She stated that Johnson could not have formed the *mens rea* to commit the crime for which he was charged because his mental illness prevented him from coolly deliberating. (Ex. I, pg. 1630).

The point of her testimony was that Petitioner could not deliberate which was a function of his mental illness rather than drug use. Dr. English was called by the State to rebut the testimony of Dr. Delaney. The record, therefore, clearly demonstrates that calling Dr. Stewart to testify in sur-rebuttal would have been cumulative as Respondent correctly asserts. As such, this was indeed a strategic call by trial counsel and Petitioner cannot and has not demonstrated any prejudice from trial counsel's performance. *Smith v. Mitchell*, 348 F.3d 177, 199 (6th Cir. 2003).

Having reviewed the record, the decision of the post-conviction motion court is consistent with a reasonable application of *Strickland v. Washington*. The decision of the Missouri

Supreme Court is, likewise, consistent with a reasonable application of *Strickland v. Washington*, and is reasonable in light of the evidence in the record.

**Was Trial Counsel Ineffective in Failing to Suppress the Post-arrest Statements of Petitioner?**

Petitioner raised this claim in his post-conviction relief motion. Trial counsel filed a motion to suppress and had a hearing on the motion to suppress the statements of Petitioner. The motion was denied by the Missouri state trial judge. Petitioner claims that counsel should have presented evidence as to Petitioner's mental capacity to demonstrate that his statements to the police were involuntary. The post-conviction hearing court ruled that:

> As for voluntariness, it depends on the absence of police overreaching, not on the mental ability of the defendant to make a choice. *State v. Debler*, 856 S.W.2d 641, 650 (Mo. banc 1993). No evidence has been presented (or suggested) that the police acted improperly in questioning Movant. Trial counsel indicated that Movant stated he had not been mistreated in any way. Movant did not testify in this proceeding.

(Ex. E, p. 647).

In considering the issue on appeal to the Missouri Supreme Court, that court found:

> Movant avers that his trial counsel were ineffective at the motion to suppress hearing for failing to present evidence that his statements made to the police were involuntary. Movant claims his counsel should have presented evidence regarding his mental capacity demonstrating that he did not voluntarily waive his *Miranda* rights. However, in his post-conviction motion, Movant alleged that his counsel were ineffective for failing to present evidence that Movant was capable of intelligently waiving his *Miranda* rights.
>
> Any issue not raised in a Rule 29.15 motion is waived on appeal. Rule 29.15; *Barnett v. State,* 103 S.W.3d 765, 773 (Mo. banc 2003). "Pleading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal." *Johnson*, 333 S.W.3d at 471. To the extent that Movant claims his statements to the police were made involuntarily, this claim is not preserved for appellate review.
>
> Even if this claim were preserved for review, this Court already has addressed Movant's claim of having made involuntary statements to a detective investigating his crimes on direct appeal. Movant stated he "failed to complete ninth grade and was in need of medication for his mental illness at the time the statements were made." *Johnson*, 207 S.W.3d at 45. Further, Movant claimed

he was coerced by the detective's comments regarding eternal salvation and he had been in police custody for about sixteen hours. *Id.*

      The determination of "whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." *State v. Faruqi,* 344 S.W.3d 193, 203 (Mo. banc 2011) (quoting *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997)). This Court on direct appeal found the record clearly reflected the constitutional validity of Movant's waiver with respect to his *Miranda* rights.

*Johnson v. State*, 388 S.W.3d 159, 167 (Mo. banc 2012).

      Review of the record discloses that testimony demonstrated Petitioner was advised of his *Miranda* rights on numerous occasions. On all occasions Petitioner indicated to law enforcement that he understood his rights and wanted to make statements. He signed a written waiver and even initialed each right on the form.

      Petitioner never indicated that he did not understand his *Miranda* rights. He spoke freely and discussed things such as reading and reading the Bible. He even spoke of his concern for being saved and that he thought he would be executed for his crime.

      Under the ruling in *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) the focus of a knowing and intelligent waiver under *Miranda* is a consideration of matters within the totality of the circumstances. The question is not whether the suspect knew and understood every possible consequence of a waiver, but rather whether the suspect knew that he could choose not to speak with law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. *Colorado v. Spring,* 479 U.S. 564, 574 (1987). The waiver is valid even if the mental capacity, age, background, and experience prevents the suspect from understanding the warning, where the police have no way to discern the misunderstanding in the suspect's mind. *Garner v. Mitchell*, 557 F.3d 257, 261-62 (6th Cir. 2009). A signed waiver form, as is reflected in the record here, is strong

evidence that the waiver was knowingly and voluntarily made. *United States v. Skinner*, 667 F.2d 1035, 1309 (9th Cir. 1982).

As noted, earlier a hearing was held on the motion to suppress and the motion was denied. The Respondent has correctly asserted that trial counsel cannot be held liable for failing to offer a defense that is unavailable. Petitioner cannot demonstrate that he was prejudiced by counsel's failure to suppress his statements to police because under the totality of the circumstances, suppression was unwarranted. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

This Court again concludes that the decision of the post-conviction motion court is consistent with a reasonable application of *Strickland v. Washington*. Furthermore, the decision of the Missouri Supreme Court is consistent with a reasonable application of *Strickland v. Washington.* Additionally, the Missouri Supreme Court's ruling is reasonable in the light of the evidence in the record.

**Was Counsel Ineffective in Failing to Investigate and Present Evidence of Low IQ at the Suppression Hearing and at Trial?**

Here, Petitioner asserts that trial counsel should have presented the testimony of Dr. Stewart, Dr. Beaver, and Dr. Kraushaar. He argues that these witnesses would have demonstrated and established his confession was not knowing and voluntary because he did not have the mental capacity to understand his rights. It is noted these witnesses testified at the post-conviction relief hearing.

Mental capacity is only one of the factors in the totality of the circumstances governing whether a suspect knowingly and voluntarily waived *Miranda*. *Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009). Diminished capacity does not render a suspect's waiver of *Miranda* unknowing and involuntary. *Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009).

This claim was considered upon hearing by the post-conviction motion court. That court found that:

The next allegation of the amended motion asserts trial counsel ineffectiveness in failing to present rebuttal testimony during the motion to suppress Movant's confessions regarding his mental illness to prove that he was incompetent to waive his Miranda rights due to his mental illness. ...

Initially the Court notes that, in a motion to suppress a defendant's confession, his mental condition is irrelevant; the critical question is the conduct of the police, including the accuracy of the information given the defendant. *State v. Brown*, 998 S.W.2d 531 (Mo. 1999). The ability of a defendant to voluntarily confess springs from the absence of police coercion, not the defendant's mental condition. *Colorado v. Connelly*, 479 U.S. 157, 169-71, 93 L.Ed. 473, 107 S.Ct. 515 (1987). A defendant may knowingly confess, if he understands that he may remain silent and that the evidence may be used against him. *Colorado v. Spring*, 479 U.S. 564, 573-74, 93 L.Ed. 954, 107 S.Ct. 851 (1987). There is no requirement that the defendant fully understands all of the potential consequences of the confession. *Id*.

(Ex. E, p. 646-647).

The Missouri Supreme Court also considered this issue and ruled on the merits. The court stated:

The determination of "whether a confession is voluntary is whether the totality of circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." *State v. Faruqi*, 344 S.W. 3d 193, 203 (Mo. banc 2011)(quoting *State v. Simmons*, 944 S. W. 2d 165, 173 (Mo. Banc 1997) ).This Court on direct appeal found the record clearly reflected the constitutional validity of Movant's waiver with respect to his Miranda rights.

*Johnson v. State*, 388 S.W.3d 159, 167 (Mo. banc 2012).

At the post-conviction relief hearing, Dr. Stewart testified that Petitioner was psychotic but did not relate that testimony to the voluntariness of his *Miranda* waiver. (Ex. E, pg. 250, 647). Dr. Beaver testified that Petitioner suffered from organic brain syndrome but also did not relate that testimony to the voluntariness of his *Miranda* waiver. (Ex. E, pg. 647). Lastly, Dr. Kraushaar testified that Petitioner lacked the mental capacity to voluntarily waive his *Miranda* rights but she admitted to not conducting any validity testing for her opinion. (Ex. E, pg. 648).

In addition, trial counsel presented extensive evidence of Petitioner's diminished mental capacity and learning disability. Evidence of a learning disability was presented through Dr. Rabun. Petitioner's elementary school principal also testified to him having a learning disability. Dr. Delaney testified that Petitioner had a diminished capacity and could not form the appropriate mental state to commit the crime. The testimony of Delaney at trial and the desired testimony of Dr. Kraushaar at the post-conviction relief motion hearing are not dissimilar. Since counsel presented the evidence Petitioner desired how can it be said Petitioner was prejudiced by the performance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984).

This Court concludes that the decision of the post-conviction motion court is consistent with a reasonable application of *Strickland v. Washington*. Furthermore, the decision of the Missouri Supreme Court is consistent with a reasonable application of *Strickland v. Washington.* Additionally, the Missouri Supreme Court's ruling is reasonable in the light of the evidence in the record.

**Was the Death Sentence Unconstitutional Because Petitioner is Mentally Retarded?**

Petitioner asserts for the first time in his Section 2254 proceeding that Dr. English performed an IQ test which resulted in a score of 70 for the Petitioner. He now argues that his score falls within the range for mental retardation as set by the American Association of Mental Retardation. A considerable number of experts testified at trial and several testified in the pos-conviction relief motion hearing. No expert ever opined that Petitioner was mentally retarded. Petitioner does not aver any showing on cause and prejudice that would justify being fully reviewed. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). This was not raised on direct appeal or in his appeal from the motion court's denial of his motion for post-conviction relief. As such the claim is defaulted. And is without merit. *Sweet*, 125 F.3d at 1149. In order to satisfy the "cause" requirement, a petitioner must show that an "external" impediment prevented him from presenting

his claim to the state court in a procedurally proper manner. *Coleman v. Thompson*, 501 U.S. 722,

750 (1991). Petitioner has failed in this endeavor.

**Did the Prosecutor Make Improper Arguments in the Guilt and Penalty Phase of Closing
Arguments in Derogation of His Eighth and Fourteenth Amendment Rights?**

Petitioner alleges that the prosecutor engaged in improper arguments in the guilt and penalty

phase closing arguments. He maintains the State improperly argued that he should be found

responsible "for once."  He further asserts that during the guilt phase the prosecutor repeatedly

suggested that petitioner had never been held responsible for his prior acts of misconduct.

Petitioner also asserts that in the penalty phase closing arguments the prosecutor improperly urged

the jury to reject the extreme emotional disturbance mitigating circumstance by considering false

evidence that petitioner was high on methamphetamine at the time the homicide occurred.

On direct appeal to the Supreme Court of Missouri Petitioner pursued a guilt phase

argument claim relating to the State's argument that Petitioner should be found responsible for his

conduct "for once." The Missouri Supreme Court did not review the claim noting that he did not

demonstrate plain error and said:

> Statements made in closing argument will rarely amount to plain
> error, and any assertion that the trial court erred for failure to intervene sua sponte
> overlooks the fact that the absence of an objection by trial counsel may have
> been strategic in nature." *Cole*,71 S.W.3d at 171. Plain error relief is seldom
> granted on assertions of error relating to closing argument because absence of
> an objection and request for relief during closing argument means that any intervention
> by the trial court would have been uninvited and may have caused increased error.
> *State* v. *Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). Johnson's plain error
> claims relating to closing arguments need not be considered unless he shows
> "there is a sound, substantial manifestation, a strong, clear showing, that injustice
> or miscarriage of justice will result if relief is not given." *State v. Wood*,
> 719 S.W.2d 756, 759 (Mo. banc 1986) (internal citations omitted).
> It is not necessary to determine the propriety of the prosecutor's
> closing remarks in this case. When manifest injustice is the standard, improper
> argument results in reversal of a conviction only if it is established that the
> argument in question had a decisive effect on the jury's determination. *State v. Wren*,
> 643 S.W.2d 800, 802 (Mo. banc 1983). The defendant bears the burden to

prove the decisive significance. *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993).
In light of the evidence presented in this case, Johnson fails to show
how the prosecutor's comments had a decisive effect on the jury's verdict.

*State v. Johnson*, 207 S.W.3d at 49.

Scouring the record, the court concludes the Missouri Supreme Court found, reasonably so, that Petitioner failed to present the claim to the trial court. This is likewise true of his other claims relating to improper arguments by the State. As these claims were not previously presented Petitioner has defaulted these claims and has failed to demonstrate cause and prejudice under *Murray v. Carrier*, 477 U.S. 478 (1986).

<u>Request for Evidentiary Hearing</u>

On December 3, 2019, Petitioner made an oral request for an evidentiary hearing in order to introduce evidence in support of his claim set out in Claim 9 of his Petition relating to improper arguments by the State in the guilt and penalty phase of the trial. As the court has fully reviewed the record relating to those claims and concluded them to be defaulted and bared, the request for hearing will be denied.

<u>Conclusion</u>

Based upon the foregoing analysis, petitioner is not entitled to habeas relief under <u>28 U.S.C. § 2254</u>.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Johnny A. Johnson for writ of habeas corpus pursuant to <u>28 U.S.C. § 2254</u> [Doc. No. 35] and the request for an evidentiary hearing are denied.

**IT IS FURTHER ORDERED** that petitioner has not made a substantial showing of the denial of a constitutional right and the Court will not issue a certificate of appealability. "A

substantial showing is a showing that a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v.Norris*, 133 F.3d 565, 569 (8th Cir. 1997), cert. denied, 525 U.S. 834 (1998).

A separate judgment in accordance with the Memorandum and Order is entered this same date.

Dated this 28th day of February, 2020

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT  JUDGE